UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| LaTasha Marlene Jackson, | ) | C/A No. 5:12-00686-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| Carolyn W. Colvin,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 DSC for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pro se pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim for Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court *affirms* the Commissioner's decision, as discussed herein.

I.      Relevant Background

A.      Procedural History

Plaintiff filed her application for SSI on August 8, 2007, alleging she became disabled on January 1, 2007. Tr. 173. In her form disability report, Plaintiff stated she became unable to work on June 1, 2001, because of constant pain in her lower abdomen, sharp pains in her lower right side, migraine headaches, lower back pain, trouble holding urine, dizzy spells, and nausea. Tr.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Carolyn W. Colvin for Michael J. Astrue as Defendant in this action.

180-81. Her application was denied initially and upon reconsideration, Tr. 87-95, and Plaintiff requested a hearing, Tr. 96. An Administrative Law Judge ("ALJ") initiated a hearing on January 29, 2010, but continued the hearing to allow Plaintiff the opportunity to secure legal counsel. Tr. 51-77.  The hearing reconvened on May 28, 2010, and Plaintiff chose to proceed without counsel. Tr. 19-50.  The ALJ issued an unfavorable decision on June 23, 2010. Tr. 8-18. The Appeals Council denied Plaintiff's request for review on February 8, 2012, making the ALJ's decision the final decision for purposes of judicial review. Tr. 1-3. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a pro se Complaint filed on March 8, 2012. ECF No. 1.

      B.      Plaintiff's Background and Medical History

           1.      Background

Plaintiff was born on January 9, 1980, and was 27 years old on the date her application for SSI was filed. Tr. 16. Plaintiff completed high school and attended college for approximately nine months. Tr. 188. Plaintiff's work history includes work in a fast food restaurant and on a manufacturing production line. Tr. 190-92.  As of the date of the hearing, Plaintiff lived with her parents and older sister. Tr. 23.

           2.      Medical History[2]

On November 6, 2006, Plaintiff slipped and fell in water on the fifth floor of Medical College of Georgia ("MCG") hospital and was taken to the MCG Emergency Department complaining of right knee pain, low back pain, and flank pain. Tr. 307-14, 545.  X-rays of her right knee revealed no acute fracture or dislocation. Tr. 309. She was discharged on November 7, 2006, with a prescription for Vicodin to take as needed for pain. Tr. 304.  Plaintiff returned to the

---

[2] Although Plaintiff alleges her disability began June 1, 2001, *see* Tr. 181, no medical records prior to November 2006 have been made part of the record, nor does Plaintiff specifically discuss conditions or treatment prior to 2006.

MCG Emergency Department on November 20, 2006, still complaining of right knee pain. Tr. 302. The medical assessment noted that she had no primary care physician with whom she could follow-up. *Id.* Plaintiff was treated and discharged with instructions to follow-up with her regular doctor or orthopedic surgery as directed. Tr. 299. An MRI of Plaintiff's right knee was performed on December 8, 2006, at MCG Health, Inc. and she was diagnosed with a "[t]ear of the peripheral portion of the anterior horn of the lateral meniscus." Tr. 346-47. After consultation, Plaintiff underwent a diagnostic arthroscopy of her knee which revealed no evidence of pathology other than "minimal grade II changes of chondromalacia[3] on the lateral tibia." Tr. 319-21. Plaintiff continued with follow-up appointments and physical therapy with MCG Health Sports Medicine Center. On March 12, 2007, she reported that her knee was much better, and she had no complaints about her knee. Plaintiff was released from care on March 12, 2007. Tr. 315-18.

In 2006 and early 2007 Plaintiff was treated by Dr. Oletha R. Minto of Aiken Obstetrics & Gynecology Associates for issues related to pain and severe dysmenorrhea;[4] Dr. Minto's treatments included multiple laparotomies;[5] a laparoscopy; and several cycles of Lupron.[6] Tr.

---

[3] Chondromalacia patella is a common cause of kneecap pain or anterior knee pain. Often called "Runner's Knee," this condition often affects young, otherwise healthy athletes. Chondromalacia is due to an irritation of the undersurface of the kneecap. *See* http://orthopedics.about.com/cs/patelladisorders/a/chondromalacia.htm (last visited August 12, 2013).
[4] Dysmenorrhea is the medical term for menstrual cramps. *See* http://pms.about.com/od/menstrualcramps/Menstrual_Cramps_Dysmenorrhea.htm (last visited August 12, 2013).
[5] A laparotomy is a large incision made into the abdomen. Laparotomy may be performed to determine the cause of a patient's symptoms or to establish the extent of a disease. Exploratory laparotomy may be used to examine the abdominal and pelvic organs (such as the ovaries, fallopian tubes, bladder, and rectum) for evidence of endometriosis. *See* http://www.surgeryencyclopedia.com/La-Pa/Laparotomy-Exploratory.html (last visited August 12, 2013).
[6] Lupron Depot (leuprolide acetate for depot suspension) is a prescription treatment for endometriosis, given as an injection by a healthcare professional. It can help relieve the pain of

351-54, 360-64.  On October 2, 2006, Plaintiff requested that Dr. Minto provide her with a letter to Medicaid stating that she was unable to work because of her condition. Tr. 353. Dr. Minto said that she could not write such a letter because she had not said that Plaintiff was unable to work. *Id.*  In December 2006, January and February 2007, Plaintiff had discussions with Dr. Minto about scheduling surgery for a hysterectomy. Tr. 351-53.  In late March 2007 Dr. Minto sent a letter to Plaintiff terminating the physician-patient relationship in "the interest of patient care." Tr. 349.

On May 4, 2007, Dr. Gasnel E. Bryan performed a total abdominal hysterectomy with right salpingectomy[7] on Plaintiff at Aiken Regional Medical Center. Tr. 374-75.  Plaintiff returned to Aiken Regional Medical Center on June 19, 2007, complaining of "severe intractable pelvic and abdominal pain associated with nausea, vomiting and dizziness." Tr. 365. A CT scan revealed left hydronephrosis[8] with left ureter, and possible stricture of the distal ureter. *Id.* Dr. Prakash Maniam of Urology of Aiken, LLC performed a cystoscopy, retrograde pyelogram, left ureteroscopy, and left ureteral stent placement on Plaintiff. *Id.*  Plaintiff was discharged in good condition on June 22, 2007. *Id.*

Plaintiff was seen by Dr. Maniam on June 26, 2007, complaining of pain in the left flank and bladder following the left stent placement. Tr. 502. Dr. Maniam opined that Plaintiff's symptoms were related to stent irritation, but that he wanted the stent to remain in place. *Id.*  Dr.

---

endometriosis and reduce lesions.  *See* http://www.endofacts.com/about-lupron-depot.aspx (last visited August 12, 2013).

[7] Surgical removal of right Fallopian tube. *See* http://medical-dictionary.thefreedictionary.com/salpingectomy (last visited August 12, 2013).

[8] Hydronephrosis is a condition where one or both kidneys become stretched and swollen as a result of a build-up of urine inside the kidney(s). It can occur when there is a blockage in the urinary tract or when something disrupts the normal workings of the bladder which causes urine to flow back from the bladder and into the kidney(s). *See* http://www.nhs.uk/conditions/Hydronephrosis/Pages/Introduction.aspx (last visited August 12, 2013).

Maniam noted a telephone discussion with Plaintiff on July 3, 2007, regarding her recent complaints of pain in her left side and after urination. Tr. 503. He "reassured her that this sounds like it is from the stent and gave the options of removing it or keeping it to help dilate the ureter and hopefully avoid an open procedure." *Id.* Plaintiff agreed to continue with the stent. *Id.* Plaintiff was seen by Dr. Maniam on July 11, 2007, complaining of "low energy, malaise, and significant pain on the left side." Tr. 504. Dr. Maniam determined that due to Plaintiff's pain he would remove the stent. *Id.* On July 18, 2007, Dr. Maniam removed the stent in a procedure performed in his office. Tr. 505.

Plaintiff returned to Aiken Regional Medical Center on August 1, 2007, with "severe left renal colic." Tr. 388. Plaintiff was diagnosed with left ureteral stricture. *Id.* A cystoscopy was performed, and a stent placed to dilate the ureter. *Id.* Plaintiff was unable to tolerate the stent and it was removed. After discussions with the surgeon, Plaintiff opted for a ureteral reimplant.[9] *Id.* After the surgery Plaintiff remained in the hospital until August 6, 2007 when she was "discharged to home in good condition." Tr. 387. Plaintiff was seen by Dr. Maniam on August 10, 2007, for follow-up from the reimplantation. Tr. 506. Dr. Maniam noted that the incision site looked good, and that he would see Plaintiff in two weeks for stent removal. *Id.* He also noted that he was controlling Plaintiff's pain symptoms with Darvocet and Detrol. *Id.* Plaintiff returned to Dr. Maniam on August 17, 2007, complaining of "nausea and bilateral flank pain, mostly on the left." Tr. 507. Dr. Maniam noted the pain was "probably related to stent irritation."

---

[9] In ureteral reimplantation surgery the original ureter is surgically re-positioned (reimplanted) in the bladder wall. The end of the ureter is surrounded by bladder muscle in this new position, which prevents urine from "backing up" (refluxing) toward the bladder. *See* http://urology.ucsf.edu/patient-care/children/pediatric-urology-patient-information (procedures--PDF "Ureteral Reimplantation Surgery") (last visited August 12, 2013).

*Id.* He gave Plaintiff a prescription for Bactrim DS #14 for possible pyelonephritis,[10] and Mepergan instead of Darvocet to control her nausea. *Id.* On August 27, 2007, Plaintiff was seen by Dr. Maniam for follow-up post stent removal. Tr. 508.

Plaintiff was admitted to Aiken Regional Medical Center on September 10, 2007, with recurrence of distal ureteral stricture. Tr. 509. Dr. Maniam recommended "cystoscopy and incision of the ureteral stricture with possible balloon dilation and stent placement." *Id.* Plaintiff underwent surgery on September 11, 2007. Tr. 510-14.

On October 22, 2007, Medical Consultant William Lindler reviewed Plaintiff's medical records and assessed her physical residual functional capacity ("RFC"). Tr. 515-22. MC Lindler opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently and that she was able to stand, walk, and sit for up to six hours each (with normal breaks) in an eight-hour workday. He opined that Plaintiff's ability to push and/or pull was unlimited other than as shown for lift and carry. He opined Plaintiff could frequently climb a ramp or stairs; occasionally climb a ladder, rope, or scaffold; could frequently balance, stoop, kneel, crouch, or crawl. Tr. 517. MC Lindler found that Plaintiff had no manipulative, visual, communicative, or environmental limitations. Tr. 518-19.

On November 19, 2007, Plaintiff had a routine IVP[11] performed as follow-up to her left ureteral reimplant. Tr. 525-28. The test results noted adequate drainage of the left renal collecting system, although there was some "mild calyceal blunting that is persistent with minimal prominence to the proximal mid left ureter." Tr. 525-26. On December 14, 2007,

---

[10] Bacterial infection of the kidney. *See* Attorney's Illustrated Medical Dictionary P93 (1997).
[11] An intravenous pyelogram (IVP) is an x-ray test that provides pictures of the kidneys, the bladder, the ureters, and the urethra (urinary tract). *See* http://www.webmd.com/a-to-z-guides/intravenous-pyelogram-ivp (last visited August 12, 2013).

Plaintiff had a renal ultrasound because of her complaints of left-sided flank pain and surgical history. Tr. 529. The results were negative, and there was no hydronephrosis. *Id.*

Dr. Maniam submitted a disability report on March 4, 2008. Tr. 530-31. He noted that Plaintiff "achieved effective resolution of the [urethral] obstruction," but noted that "she has had chronic pain symptoms related to the back since her surgery." Tr. 530. Dr. Maniam opined that "[t]his is felt to be possibly related to muscle spasm or the muscle irritated due to the psoas hitch."[12] *Id.* Dr. Maniam noted that Plaintiff "has been relatively inactive" and that he was "attempting to get her into physical therapy." *Id.* His last visit with Plaintiff was on January 17, 2008, and Dr. Maniam noted that, at that time, Plaintiff continued to have "left-sided back discomfort." *Id.* He also noted that Plaintiff was able to do housework, but that "she was avoiding doing any bending or lifting because this seemed to worsen the pain." *Id.*

Medical Consultant Katrina B. Doig, M.D. conducted a Physical RFC Assessment of Plaintiff on April 14, 2008. Tr. 532-39. Dr. Doig opined that Plaintiff could occasionally lift 20 pounds, frequently lift and/or carry 10 pounds, and that she was able to stand and/or walk for at least six hours (with normal breaks) in an eight-hour workday, and sit for up to six hours (with normal breaks) in an eight-hour workday. Tr. 533. Dr. Doig opined that Plaintiff's ability to push and/or pull was unlimited other than as shown for lift and/or carry. *Id.* Dr. Doig limited Plaintiff's ability to climb a ramp/stairs, balance, kneel, and crouch to frequently; and her ability to climb ladder/rope/scaffolds, to stoop, or to crawl to occasionally. Tr. 534. Dr. Doig found Plaintiff had no manipulative, visual, communicative, or environmental limitations. Tr. 535-36. Dr. Doig commented that Plaintiff's symptoms were credible as reflected in the RFC. Tr. 537.

---

[12] Ureteral reimplantation where the posterior bladder wall is tacked to the psoas muscle. *See* http://emedicine.medscape.com/article/1893904-overview (last visited August 12, 2013).

On November 14, 2008, Dr. Reddiah Mummaneni of Aiken Neurosciences, PC, submitted an evaluation letter regarding Plaintiff's headaches. Tr. 567-68. Plaintiff's general exam and neurological evaluation were normal, but Dr. Mummaneni ordered an MRI and MRA of Plaintiff's brain "to rule out if there is anything structurally going on in the brain." Tr. 568. The final test reports from the MRI and MRA were normal. Tr. 572-73. In his neurology follow-up Dr. Mummaneni opined that Plaintiff "might be having some low grade meningitis due to autoimmune disorder." Tr. 574. He noted that he would schedule Plaintiff for a lumbar puncture study and start her on 60 mg of Prednisone. *Id.* Dr. Mummaneni performed the lumbar puncture on December 4, 2008. Tr. 578. The results of the tests were normal. Tr. 579-91. On December 11, 2008, Dr. Mummaneni continued Plaintiff's current medications of Amitriptyline and Prednisone, and added triptans. Tr. 591. He provided Plaintiff with samples of Maxalt 10 mg and instructed her not to take more than 20 mg per 24 hours. *Id.* Plaintiff returned to Dr. Mummaneni on December 16, 2008 for follow-up. Tr. 592. Because the prescribed medications were not having any benefit, Dr. Mummaneni stopped the medications. *Id.* He opined that Plaintiff "might have chronic paroxysmal hemicranias," but noted that she had "some features of hemicranias symptoms but not all of them." *Id.* Dr. Mummaneni started Plaintiff on Indocin 50 mg for one day and then increased to 150 mg daily. *Id.* On December 31, 2008, Plaintiff returned for a neurology follow-up. Tr. 593. Plaintiff reported a 50-60% percent improvement in the headaches. *Id.* Dr. Mummaneni's impression was that Plaintiff was most likely experiencing chronic paroxysmal hemicranias; he continued her on the Indocin 50 mg three times a day. *Id.* Plaintiff returned to Dr. Mummaneni on February 16, 2009, for neurology follow-up. Tr. 596. Dr. Mummaneni noted the reason for Plaintiff's headaches was unclear, and that the headaches may be migraines versus chronic paroxysmal hemicrania. *Id.* Plaintiff stated that she was having

some stomach problems from the Indocin and had to stop taking it. *Id.* Plaintiff did not want to start any new medications. *Id.* Dr. Mummaneni noted that Plaintiff was "doing decently well compared to how she came in initially." *Id.*

Plaintiff reported to Aiken Regional Medical Center on April 26, 2009, complaining of lower abdominal cramps, nausea, and vomiting. Tr. 599-605.  She was diagnosed with gastroenteritis, treated, and discharged. Tr. 602. Plaintiff returned to Aiken Regional Medical Center on June 18, 2009 complaining of bilateral ear pain for two days. Tr. 609. Plaintiff was diagnosed with ear pain and fluid behind her right ear drum, treated, and discharged. Tr. 610-13.

On August 28, 2009, Plaintiff was seen by cardiologist Ansermo L. Arthur, M.D. of Carolina Heart & Vascular Center for bradycardia. Tr. 626.  After examination the sinus bradycardia was unchanged from Plaintiff's last visit and she was asymptomatic. Tr. 627. Plaintiff was scheduled for an event monitor. *Id.* Plaintiff returned to Dr. Arthur on October 1, 2009 complaining of chest pain. Tr. 624. After physical examination Dr. Arthur noted that he was "[s]till not sure if this is related to CAD. Schedule cardiac cath." Tr. 625. On October 6, 2009, Plaintiff underwent a cardiac catheterization. Tr. 615-17, 629. On October 14, 2009, Plaintiff was referred to Aiken Cardiovascular Associates for imaging of her right groin due to pain status post catheterization. Tr. 618. The results indicated "no evidence of pseudoaneurysm." *Id.* On November 5, 2009, Plaintiff was seen by Dr. Arthur regarding her complaints of chest pain. Tr. 622. Dr. Arthur noted Plaintiff's negative test results and that she had no symptoms attributable to valvular heart disease. *Id.* Dr. Arthur started Plaintiff on Cipro 500 mg and Vesicare 10 mg. Tr. 623.

Dr. Gasnel Bryan provided an Excuse Slip for Plaintiff dated April 27, 2010 noting that Plaintiff was unable to travel because of surgery on April 16, 2010, [13] and complications from surgery that resulted in her being re-hospitalized April 23-27, 2010. Tr. 631. The note indicated Plaintiff would be able to return to work after six weeks. *Id.*

### 4.    Additional Medical Evidence[14]

Plaintiff submitted additional medical records as attachments to her response brief for the court's consideration.  These included hospital records from a visit to the GYN Service at Aiken Regional Medical Center on September 7, 2012, ECF No. 39-1, and visits Plaintiff made to the Aiken Regional Medical Center Emergency Room on October 19, 2012, and November 23, 2012, ECF Nos. 44-1 and 45-1. On September 7, 2012, Plaintiff was admitted for exploratory surgery by Dr. Bryan due to an increase in severity of symptoms related to lower abdominal pain. ECF No. 39-1 at 5. The findings were "consistent with extensive postoperative intestinal, peritoneal, and pelvic adhesions and partial small bowel obstruction." *Id.* Plaintiff was "treated symptomatically" and discharged in "fairly good condition" on September 13, 2012. *Id.* Plaintiff went to the hospital on October 19, 2012 complaining of chest pain. ECF 44-1 at 24. Chest x-rays revealed no acute cardiopulmonary process. *Id.* at 26. On November 23, 2012, Plaintiff presented to the hospital with a headache. ECF No. 45-1 at 5. The diagnosis was headache

---

[13] Plaintiff testified at her administrative hearing that Dr. Bryan is her OBGYN, and on April 16, 2010, he performed a procedure to remove scar tissue. Tr. 28.

[14] As discussed within, this additional evidence is not part of the administrative record. A court's substantial-evidence review under 42 U.S.C. § 405(g) (sentence four) is limited to the certified administrative record. *Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc) (quoting *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) ("'Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence.'")). Further, when it may be considered at all, evidence not before the ALJ is considered only when it is "new and material" and "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). This additional evidence is from 2012, and there is no indication it relates to the period before the ALJ's June 23, 2010 decision under review herein.

unspecified, and the notes indicated that the headache did "not appear to be the sign of any serious illness." *Id.* at 11.

C.    The Administrative Proceedings

1.    Plaintiff's Testimony

Plaintiff appeared for an administrative hearing on January 29, 2010. Tr. 51-76. Plaintiff testified that she was 30 years old, was single, and lived with her parents. Tr. 54. Plaintiff stated that she was no longer represented by counsel, Tr. 55, and was unable to secure another representative so close to the hearing date, Tr. 68.  The ALJ agreed to continue the hearing to allow Plaintiff the opportunity to seek a representative. Tr. 72-76.

At the May 28, 2010 hearing, Plaintiff appeared pro se and indicated she was unable to find a representative. Tr. 22. Plaintiff testified that she and her 40-year-old sister lived with their parents. Tr. 23. Plaintiff testified that she never had a driver's license. Tr. 23-24. When asked to describe her work record for the past 15 years Plaintiff stated that she worked at Carlisle Tire and Wheel in 2000 and 2001 on the production line piercing rims. Tr. 24.  Before that she worked at Hardy's [sic] as a cook and she would occasionally answer the phone. *Id.*  When asked by the ALJ why she felt she warranted disability benefits, Plaintiff stated that she had "a lot of medical problems." Tr. 25. She indicated that she had been diagnosed by Dr. Mummaneni with "chronic paroxysmal hemicranias continua" in 2009. Tr. 25. Plaintiff stated that for relief from the headaches she was taking over-the-counter Aleve. Tr. 26.  She also stated that she had back problems and had received injections from Dr. William Derret, but "due to some financial problems with Dr. Derret," she was "put on hold." *Id.* Plaintiff stated she was diagnosed with degenerative disc disease and lumbago. Tr. 27. She stated she was also diagnosed with "left urethia stricture" and was taking Vesicare as prescribed by Dr. Maniam. Tr. 27-28. Plaintiff

testified that she had recently been treated by Dr. Bryant [sic] in a surgical procedure to remove scar tissue. Tr. 28.  Plaintiff further testified that in October 2009 Dr. Arthur had diagnosed her with "bradycardia with a hint of sinus tachycardia." Tr. 29. Plaintiff testified that due to her health problems she had problems bending, her headaches would come and go, and she had constant stomach problems. Tr. 30. She also stated that she was still having problems with her knee from a right knee arthroscopy she had in 2006. *Id.* Plaintiff said she could possibly lift 30 pounds before her surgery. Tr. 31. She testified that she was unable to stand for too long because it put pressure on her back, but she could alternate between sitting and standing for three to four hours. *Id.*

### 2.    Witnesses Testimony

Plaintiff's mother, Lucille Jackson, testified that Plaintiff was unable to do anything, and she had to help Plaintiff. Tr. 37.  Plaintiff's father, Willie Lee Jackson, testified that Plaintiff complained of "headaches most of the time and her back and her stomach." Tr. 39. Plaintiff's sister, Reville Jackson, testified that she observed Plaintiff being unable to get out of bed some mornings, and that Plaintiff was "in a lot of pain." Tr. 41-42. She also stated that Plaintiff was "depressed a lot," had "a lot of headaches," and had "[h]ead problems and back problems." Tr. 42.

### 3.    Vocational Expert Testimony

Vocational Expert ("VE") William Stewart also testified at the administrative hearing. Tr. 44-49. Dr. Stewart stated that Plaintiff's past work as a piercer of car and truck rims was in the medium category with an SVP of five, and her job as a fast food cook was light work with an SVP of three. Tr. 45.  The ALJ posed a hypothetical question regarding an individual who was the same age as Plaintiff with the same education and prior work experience and was limited to

the following RFC: performing work that required no lifting or carrying over 20 pounds occasionally, and only ten pounds frequently, with a sit/stand option at the workstation, with only occasional stooping, twisting, crouching, kneeling, crawling, and climbing of stairs and ramps; no climbing of ladders or scaffolds. Tr. 46.

The VE found that one with such limitations would be unable to perform Plaintiff's past relevant work ("PRW"). *Id.* The VE testified that the hypothetical individual would have the following transferable skills: "some clerical skills, some numerical skill and some mechanical skill as far as operating machinery or equipment." *Id.*  The VE identified the following jobs that an individual, who was a high school graduate, could perform utilizing those skills: (1) an order clerk; sedentary work, SVP of three; 4,000 in South Carolina; 70,000 nationally; DOT number 249362026; (2) low semi-skilled inspector examiner or quality control clerk; sedentary; SVP of three; 3,000 in South Carolina; 45,000 nationally; DOT number 733687042;  and (3) cashier; sedentary; SVP of four; 2,000 in South Carolina; 35,000 nationally; DOT number 211.462-010. Tr. 48.  When asked by the ALJ if there was any conflict between the jobs cited and the DOT, the VE stated that the DOT does not describe the sit/stand option but it was based on his "40-plus years working with people with disabilities and handicaps." Tr. 49.

D.    The ALJ's Findings

In his June 23, 2010 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since August 8, 2007, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: low back pain, abdominal pain, left ureteral stricture, and migraine headaches versus chronic paroxysmal hemicranias (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR

13

Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) with the exceptions of a sit/stand option at the workstation with the need to change positions every 60 minutes; only occasional stooping, twisting, crouching, kneeling, crawling, or climbing of stairs or ramps; and no climbing of ladders or scaffolds.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on January 9, 1980 and was 27 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  The claimant has acquired work skills from past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 416.969, 416.969(a) and 416.968(d)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 8, 2007, the date the application was filed (20 CFR 416.920(g)).

Tr. 10-17.

II.  Discussion

A.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[15] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[15] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id., Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

In her Complaint, Plaintiff alleges that she has been diagnosed with the chronic illnesses of fibromyalgia, myalgias, and myofascial pain syndrome, and that they prevent her from working. Compl. 3, ECF No. 1. Plaintiff also notes that she has chronic paroxysmal hemicranias continua, a rare condition that causes serious headaches; a reappearance of pelvic peritoneal adhesions; and degenerative disc lumbar and lumbago disease. *Id.* In her Complaint Plaintiff asks the court to review her case because she "need[s] for this court to say that [she] is physically and gainfully incapable of working and should be rightfully deemed disabled." *Id.* at 5.  In her Brief, Plaintiff contends that she should be considered disabled based on the medical condition of fibromyalgia and the reoccurring issue of abdominal adhesions. Pl.'s Br. 2, ECF No. 35. Plaintiff contends her "impairments prevent [her] from performing all types of qualified works."

*Id.* at 3. Plaintiff asserts that her medical records provide evidence to support her argument. *Id.* at 4.

Defendant contends that Plaintiff has failed to sustain her burden that her impairments render her unable to engage in substantial gainful activity. Def.'s Br. 6, ECF No. 40.  Defendant argues that the ALJ properly considered the objective medical record, including the reports of examining and non-examining physicians, and the record does not support findings of limitations greater than those found by the ALJ. *Id.* at 7.

The ALJ's findings are supported by the medical records, and by Plaintiff's failure to produce any evidence that an examining or treating physician has imposed any limitations on Plaintiff's ability to perform basic work activities.  Plaintiff appears to argue that the ALJ should have found her disabled based on her allegations of physical pain. Pl's. Br. 2.

SSR 96-7p requires that, prior to considering Plaintiff's subjective complaints, the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step—consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of her subjective complaints, including pain. *See* SSR 96-7p, 61 Fed. Reg. 34483-01, 34484-85 (July 2, 1996); *see also* 20 C.F.R. § 416.929; *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996).

The requirement of considering a claimant's subjective complaints does not mean the Commissioner must accept those complaints on their face. The ALJ may consider the claimant's credibility in light of her testimony and the record as a whole. If he rejects a claimant's testimony about her pain or physical condition, the ALJ must explain the basis for such rejection to ensure

that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 61 Fed. Reg. at 34486.

The ALJ limited Plaintiff to sedentary work with a sit/stand option with the need to change positions every 60 minutes; only occasional stooping, twisting, crouching, kneeling, crawling, or climbing of stairs or ramps; and no climbing of ladders or scaffolds. Tr. 13. The court finds that, as part of his review of the record as a whole, the ALJ properly completed Step Two of the analysis SSR 96-7p sets out for considering whether a claimant's subjective complaints are credible. The ALJ determined that Plaintiff's claims regarding the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment in light of her activities, and the hearing testimony. *See* SSR 96-7p, 61 Fed. Reg. at 34485 (requiring that ALJ "make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). Factors the ALJ is to consider include claimant's use of pain medication or other treatments for subjective symptoms. *See id.*, 20 C.F.R. § 416.929(c)(3).

The ALJ considered Plaintiff's claims, as appropriate, during his discussion of Plaintiff's RFC. The ALJ detailed Plaintiff's testimony regarding her headaches and associated symptoms, included her testimony that "she was not taking any prescribed medication for it at this time but takes over-the-counter Aleve when necessary." Tr. 14. Regarding Plaintiff's claims of residual

pain from surgery for adhesions, and back pain due to degenerative disc disease and lumbago, the ALJ examined the record evidence concerning these claims and found no substantial evidence or no diagnostic evidence to support these assertions. Tr. 15.  He noted that after Plaintiff's abdominal surgery in April 2010, Dr. Bryan indicated that she could return to work in approximately six weeks. *Id.* The fact that Plaintiff was not prescribed pain management or assistive devices suggests that her impairments and their associated pain symptoms are controlled to an adequate degree with over-the-counter medication. This evidence considered by the ALJ also bolsters his finding.  *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (noting if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling under the Act).  The court finds the ALJ's thorough review of the record as a whole, including his articulated reasons for discounting Plaintiff's claims, supports a finding that the Commissioner's decision to deny benefits should be affirmed.  *See Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000) (noting ALJ may discount a claimant's complaints if inconsistencies are apparent in the evidence as a whole).

Although Plaintiff alleges that her diagnoses of fibromyalgia, myalgias, and myofascial pain syndrome are chronic illnesses that affect her muscles and "create[] a great deal of pain constantly," the ALJ had none of these diagnoses before him in the form of medical records or Plaintiff's testimony. Furthermore, Plaintiff has not provided any medical records or other evidence supporting these diagnoses.[16] Plaintiff testified at the hearing, Tr. 27, and alleges in her

_____

[16] Although Plaintiff provided the court with additional medical records as attachments to her Brief, none of those records indicated any diagnoses of fibromyalgia, myalgia, myofascial pain syndrome, or degenerative disc lumbar and lumbago disease. *See* ECF Nos. 39, 44, 45. Plaintiff refers to "[m]ore sufficient medical records" that have been provided "since the ALJ's last thorough out look of decision making," but those records have not been provided to the court. ECF No. 41 at 4-5. In any event, no such records were before the ALJ prior to his decision, nor were they presented to the Commissioner in any form. The court cannot now consider additional documents. *See Wilkins*, 953 F.2d at 96 (noting reviewing courts limited to considering

Complaint, Compl. 3-4, that she has degenerative disc disease "which reduces [her] ability to bend and/or lift as it seems to only worsen the pain." However, as noted by the ALJ, "there is no diagnostic evidence to support this assertion." Tr. 15. Plaintiff has not established any error by the ALJ on this point. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (finding claimant bears the burden of proof and production through step four of the sequential evaluation). "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the [Commissioner's] decision is supported by substantial evidence." *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972); *see also* 42 U.S.C. § 405(g). Therefore, the court will not reverse the Commissioner's June 23, 2010 decision based on new information discussed by Plaintiff in her Complaint and/or Brief as this is not part of the administrative record. If the diagnoses to which Plaintiff referred (fibromyalgia, myalgias, myofascial pain syndrome, degenerative disc disease, and lumbago) show deterioration in Plaintiff's condition that occurred after the ALJ's decision, it would not be the basis for remand, but may be the grounds for a new application. *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) ("Additional evidence showing a deterioration in a claimant's condition significantly after the date of the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application for benefits.").

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal

---

administrative record). Further, for evidence not before the ALJ to be considered in any circumstance, such evidence must be "new and material" and must "relate[] to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b).

standard. *See Craig*, 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, it is hereby ORDERED that the Commissioner's decision be affirmed.

IT IS SO ORDERED.

August 12, 2013                                 Kaymani D. West
Florence, South Carolina                        United States Magistrate Judge